UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------X

CELESTINO P. MONCLOVA,

       Plaintiff,

 - against -

CITY OF NEW YORK, NEW YORK CITY DEPARTMENT
OF CORRECTIONS, and PATRICIA BELL,

       Defendants.

----------------------------------------X

**MEMORANDUM & ORDER**
12-CV-3187 (KAM)(RML)

**MATSUMOTO, UNITED STATES DISTRICT JUDGE:**

      On June 26, 2012, plaintiff Celestino P. Monclova ("Monclova" or "plaintiff") commenced this action *pro se*, alleging that defendants violated his rights pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), New York State Human Rights Law, Executive Law § 290 *et seq.* ("NYSHRL") and New York City Human Rights Law, Administrative Code §§ 8-101 *et seq.* ("NYCHRL"). (*See* Compl., ECF No. 1.)  On September 7, 2012, plaintiff retained counsel and continues to be represented in this case.  Now before the court is the City of New York, the New York City Department of Corrections, and Patricia Bell's (collectively, "defendants") motion for summary judgment.  For the reasons set forth below, the motion is granted in its entirety, and the case is dismissed.

## BACKGROUND

The following facts, taken from the parties'
statements pursuant to Local Civil Rule 56.1 and accompanying
affidavits and exhibits, are undisputed and supported by
admissible evidence unless otherwise indicated.[1]  (*See* Defs. R.
56.1 Stmt., ECF No. 31; Pl. R. 56.1 Stmt., ECF No. 34; Defs.
Reply R. 56.1 Stmt., ECF No. 36.)

### I.    Alleged Sexual Harassment of Plaintiff by Defendant Bell

In 2001, plaintiff began working as a Department of
Corrections ("DOC") Correction Officer.  (Defs. R. 56.1 Stmt.
¶ 2.)  Monclova was transferred to the Special Operations
Division ("SOD") of the DOC in July of 2009.  At the SOD,
plaintiff controlled traffic and operated the facility's
security gates, among other duties that were dependent upon
where he was assigned.  (Defs. R. 56.1 Stmt. ¶ 4; Pl. R. 56.1
Stmt. ¶ 4; *see also* Monclova Dep. 32.)[2]

---

[1] As set forth in Local Civil Rule 56.1(c), "[e]ach numbered paragraph in the
statement of material facts set forth in the statement required to be served
by the moving party will be deemed admitted for purposes of the motion unless
specifically controverted by a correspondingly numbered paragraph in the
statement required to be served by the opposing party."  L. Civ. R. 56.1(c).
In addition, any evidence offered on a motion for summary judgment must be
admissible.  *Faulkner v. Arista Records LLC*, 797 F. Supp. 2d 299, 305
(S.D.N.Y. 2011) (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)).
[2] "Monclova Dep." refers to the transcript of the January 14, 2013 deposition
of plaintiff, which is labeled Exhibit 1 to the parties' Joint Deposition
Transcript Appendix, ECF No. 37-2.

In 2009, defendant Bell also worked at the SOD as a Patrol Supervisor.[3] (Defs. R. 56.1 Stmt. ¶ 6; Pl. R. 56.1 Stmt. ¶ 6.) In this role, she patrolled the facility's perimeter and parking lots, responded to emergencies, and signed the logbooks of officers who were assigned to certain posts, including the logbook of plaintiff when they were on the same shift. (Defs. R. 56.1 Stmt. ¶¶ 6-7; Pl. R. 56.1 Stmt. ¶ 7; *see also* Monclova Dep. 99.)

In approximately June of 2010, while she was patrolling, Bell began stopping briefly to speak with plaintiff, driving by plaintiff and speaking to him through the open window of her departmental vehicle. (Defs. R. 56.1 Stmt. ¶ 8; Pl. R. 56.1 Stmt. ¶ 8; Monclova Dep. 42-43.) Bell visited plaintiff at his post two or three times a week, during some periods, but there were periods of four to five weeks when Bell would not visit plaintiff at all. (Pl. R. 56.1 Stmt. ¶ 10; Defs. Reply R. 56.1 Stmt. ¶ 1; Monclova Dep. 44.) Plaintiff testified that Bell would stop to speak with him more frequently when he was assigned to Gates 5 or 9 of the SOD because those areas were more secluded. (Pl. R. 56.1 Stmt. ¶ 8; Monclova Dep. 56-57.)

---

[3] There appears to be no debate between the parties that, for the entire time relevant to this action, Bell was plaintiff's supervisor and, accordingly, that her behavior can be attributable to defendant and defendant's employer, the City of New York. *See Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 182 (2d Cir. 2012) ("An employer is presumptively liable for sexual harassment in violation of Title VII if the plaintiff was harassed not by a mere coworker but by someone with supervisory (or successively higher) authority over the plaintiff").

While speaking to plaintiff, Bell asked what plaintiff perceived to be "personal questions," including questions regarding his ethnicity and national origin, whether he was married and fathered any children, and whether he had ever cheated on his wife or fathered children with anyone other than his wife. (Defs. R. 56.1 Stmt. ¶¶ 8-9; Pls. R. 56.1 Stmt. ¶¶ 8-9, 66; Defs. Reply R. 56.1 Stmt. ¶ 17; *see also* Monclova Dep. 41-43.) Monclova testified that, during these conversations at the SOD, Bell's uniform shirt was unbuttoned to her navel. (Defs. R. 56.1 Stmt. ¶¶ 11-12; Pl. R. 56.1 Stmt. ¶¶ 8-9, 11-12, 65; Defs. Reply R. 56.1 Stmt. ¶ 16; *see also* Monclova Dep. 41, 44.) Monclova observed that Bell sometimes was wearing an undershirt and on most occasions was not, but could not discern whether Bell was wearing a bra and could not see her breasts. (*See id.*) Monclova informed Bell that he was married and had never cheated on his wife. (Defs. R. 56.1 Stmt. ¶ 10; Pl. R. 56.1 Stmt. ¶¶ 10, 66; Defs. Reply R. 56.1 Stmt. ¶ 17; *see also* Monclova Dep. 66.)

At some point in 2011, Bell and Monclova had a conversation about Monclova's family background in the presence of another officer who was researching her family ancestry while in the facility's Central Desk area. Bell researched Monclova's family history on ancestry.com and learned that plaintiff's grandfather was a Tuskegee Airman, as well as other information

4

about plaintiff's family. (Defs. R. 56.1 Stmt. ¶ 13; Pl. R. 56.1 Stmt. ¶¶ 13, 67; Defs. Reply R. 56.1 Stmt. ¶ 17.) Bell gave plaintiff a computer printout with information about his grandfather in front of another correction officer. (Defs. R. 56.1 Stmt. ¶ 13; Pl. R. 56.1 Stmt. ¶ 13; Monclova Dep. 47, 49-50.) In addition, Bell offered to accompany Monclova to his grandfather's burial site in Brooklyn, an offer Monclova found "questionable." (Defs. R. 56.1 Stmt. ¶ 14; Pl. R. 56.1 Stmt. ¶¶ 14, 68; Pl. Reply R. 56.1 Stmt. ¶ 18; Monclova Dep. 47, 51.)

On September 14, 2011, Bell told Monclova that two visitors to the DOC facility had overheard plaintiff make disrespectful comments about Jehovah's Witnesses and had complained to Bell. Plaintiff stated in a report he made the following day to the warden: "At no time did I mock any [one's] religious beliefs. However, I also usually refuse to converse with anyone who wants to give me an introduction into their religion, and I am usually very adamant in not wanting to hear what they want to share with me." (Defs. R. 56.1 Stmt. ¶ 16; Leone Reply Decl. Ex. S (plaintiff's Sept. 15, 2011 report); *see also* Bell Dep. 67-68.)[4]

---

[4] "Bell Dep." refers to the transcript of the June 26, 2013 deposition of defendant Bell, which is Exhibit 2 to the parties' Joint Deposition Transcript Appendix. "Leone Reply Decl." refers to the declaration of Kathryn E. Leone, defendants' counsel, submitted with defendants' reply papers. (ECF No. 37.)

Plaintiff's sole objection to the discussion of the September 14, 2011 complaint the two visitors made against him is that the incident is hearsay. The court concurs with defendants, however, that the report offered by

On November 23, 2011, plaintiff received a text
message from Bell that included the following message: "It's
almost Thanksgiving!  I love you and I'm thankful for having you
in my life.  Send this to everybody you are thankful for!!!!"
(Defs. R. 56.1 Stmt. ¶ 17; Pl. R. 56.1 Stmt. ¶ 17; Leone Decl.
Ex. B.)  Bell testified that she sent the group text to "a
number of . . . people," in addition to plaintiff, including
over forty employees within SOD and executive board members.
(Defs. R. 56.1 Stmt. ¶ 19; Bell Dep. 61, 136.)  Plaintiff had
not previously given Bell his phone number.  (Pl. R. 56.1 Stmt.
¶ 71.)  Although plaintiff disputes that there is any evidence
that the text was sent to people other than him, he offers no
evidence to that effect and in fact testified during his
deposition that his wife checked the message and learned it had
been sent to employees other than plaintiff.  (*Id.* ¶ 19;
Monclova Dep. 62.)

        After receiving the text message, plaintiff called
defendant Bell's number in order to determine who had texted
him.  (Defs. R. 56.1 Stmt. ¶ 18; Pl. R. 56.1 Stmt. ¶ 18.)  Bell
recalls that Monclova called her on her birthday, December 7, at
approximately 9 p.m.  (Bell Dep. 60.)  Bell answered, "What do

---

defendants and authored by plaintiff regarding Bell's recounting of the
incident (Leone Reply Decl. Ex. S) is admissible as an opposing party
statement.  *See* Fed. R. Evid. 801(d)(2)(A) (excluding from the hearsay rule
statements "offered against an opposing party" that were "made by the party
in an individual or representative capacity").

you want, Monclova? I'm on vacation." (Monclova Dep. 61.)
Bell testified that she was on a date and on vacation at the
time and told plaintiff she had sent the text out two weeks
before. (Bell Dep. 60.) When plaintiff responded that he had
thought the text came from a family member, Bell in turn stated
that she had been thinking about him and they needed to talk
when she returned to work. (Defs. R. 56.1 Stmt. ¶ 18; Pl. R.
56.1 Stmt. ¶¶ 18, 72; *see also* Monclova Dep. 62.)

Plaintiff describes a final incident prior to his
transfer from SOD to Central Visits. Plaintiff was present for
a conversation between Bell and another female employee
regarding their ex-boyfriends, at which time Bell told plaintiff
about the breakup of her last relationship. (Defs. R. 56.1
Stmt. ¶ 21; Pl. R. 56.1 Stmt. ¶ 21; *see also* Monclova Dep. 53.)

On approximately December 11, 2011, plaintiff was
transferred from SOD to the Central Visits unit. (Defs. R. 56.1
Stmt. ¶ 22; Pl. R. 56.1 Stmt. ¶ 22.) Bell had been promoted to
captain of Central Visits in April of 2011 and, accordingly,
became plaintiff's direct supervisor when he was transferred.
(Defs. R. 56.1 Stmt. ¶¶ 15, 22; Pl. R. 56.1 Stmt. ¶¶ 15, 22.)
Bell served as captain from April 2011 until her retirement in
July of 2012 but did not request that plaintiff be transferred.
(Defs. R. 56.1 Stmt. ¶¶ 23, 57; Pl. R. 56.1 Stmt. ¶¶ 23, 57; *see
also* Bell Dep. 58 (Bell's testimony that plaintiff was assigned

to Central Visit by the facility's warden and that he was on her roll call when she returned from vacation).)  Soon after plaintiff was transferred, Bell discussed with plaintiff her concerns about sending her son to boarding school, in particular that she would be alone in her home.  (Defs. R. 56.1 Stmt. ¶ 24; Pl. R. 56.1 Stmt. ¶¶ 24, 70; Defs. Reply R. 56.1 Stmt. ¶ 18; Monclova Dep. 54.)

## II.  Alleged Retaliation by Defendant Bell Against Plaintiff

Plaintiff alleges that it was around the time of his transfer to Central Visits that Bell began to retaliate against him because he assumes that she had realized that he did not wish to have a personal or sexual relationship with her.  (Defs. R. 56.1 Stmt. ¶ 27; Pl. R. 56.1 Stmt. ¶ 27; *see also* Monclova Dep. 76-77 (Monclova's testimony that he believed Bell "eventually figured it out" that he did not want a relationship with her "on a personal level," but that he never directly informed Bell that he didn't want a personal relationship with her because he felt he did not have to say that).)  He further alleges that Bell unfairly targeted him for criticism, as compared to other correction officers, sided with visitors when they made complaints, and told plaintiff he would not be transferred out of Central Visits.[5]  (Pl. R. 56.1 Stmt. ¶¶ 82-84;

---

[5] Plaintiff alleges that Bell had previously retaliated against other correction officers she did not like, including by "having visitors make complaints."  (Pl. R. 56.1 Stmt. ¶¶ 87-88.)  In support of this allegation,

Defs. Reply R. 56.1 Stmt. ¶ 21.)  At some point, plaintiff did
complain to Assistant Deputy Warden ("ADW") Stanley Chin about
Bell's treatment of him; however, the timing and content of
those complaints does not appear in the record.  (Pl. R. 56.1
Stmt. ¶ 75; Chin Dep. 71.)  ADW Chin did not, however, recall
plaintiff requesting to be removed from Bell's supervision.
(Chin Dep. 55.)

        The facts of the specific incidents plaintiff contends
were retaliatory are recounted below.  Soon after plaintiff
transferred to Central Visits, Bell reprimanded him in front of
other staff.  Plaintiff testified that defendant Bell yelled at
him in front of other employees for requiring the search of
young children visiting the facility.  (Defs. R. 56.1 Stmt.
¶ 28; Pl. R. 56.1 Stmt. ¶¶ 28, 76; *see also* Monclova Dep. 68-69
(plaintiff's testimony that Bell called him a "sadist" during
this incident).)  Plaintiff also testified that, on the same
day, Bell remarked in front of visitors and staff that "she
could not believe that somebody had married [plaintiff]" and,
upon learning that plaintiff's wife is from Guyana, that
"[plaintiff's wife] must've needed a card."  Plaintiff told Bell

---

plaintiff cites the deposition of Dana Simone Williams (Joint Deposition
Appendix Ex. 4), but it is unclear from the parties' submissions when and in
what capacity Ms. Williams worked with defendant Bell.  ADW Chin did recount
in his deposition, however, that he had brought charges against Bell in the
past for falsifying reports and disobeying orders.  (*See* Pl. R. 56.1 Stmt. ¶
89; Deposition of ADW Chin ("Chin Dep.") 39-43, dated Mar. 15, 2013, J.A. Ex.
5.)

"You better watch it. You're taking this somewhere you don't want to take it, you better stop right now," and plaintiff testified that Bell did stop. (Defs. R. 56.1 Stmt. ¶ 29; Pl. R. 56.1 Stmt. ¶¶ 29, 80; *see also* Monclova Dep. 74.) At the same time, Bell inquired as to why plaintiff had never had children. (Pl. R. 56.1 Stmt. ¶ 81; Defs. Reply R. 56.1 Stmt. ¶ 21; *see also* Monclova Dep. 75.)

On December 14, 2011, Bell met with plaintiff three times to inform plaintiff that other employees and visitors had made complaints about "the abrasive way" plaintiff performed his job. (Defs. R. 56.1 Stmt. ¶ 30; Pl. R. 56.1 Stmt. ¶ 30.) During one meeting, Bell queried whether plaintiff "acted at home with his wife the same way he acted at work with visitors." (Defs. R. 56.1 Stmt. ¶ 31; Pl. R. 56.1 Stmt. ¶ 31; *see also* Monclova Dep. 78.) When Bell told him that visitors complained that he was not helpful or social enough when he was working the scanner, he responded, "My suggestion to you is don't put me on the scanner" "'cause I do not want to be socializing with any of these individuals in Central Visits." (Monclova Dep. 78.)

A week later, on December 21, 2011, Bell again met with plaintiff to discuss a visitor's complaint. Specifically, the visitor complained to Bell that she was "very upset" and "intimidated" by the fact that plaintiff, who is taller than most people at six feet, six inches, stood with one leg on a

stool with his groin area near the visitor's face. Bell had previously directed plaintiff not to stand that way. (Defs. R. 56.1 Stmt. ¶ 32; Pl. R. 56.1 Stmt. ¶ 32; *see also* Bell Dep. 70.) Plaintiff testified that, according to Bell, the complainant could see plaintiff's genitalia pressed against his pants during this incident. He responded that there would be no further need to discuss the incident because "I'll be in the Bail Room where no one will be able to see me and be intimidated by what I am wearing or what I do or where my foot is." (Defs. R. 56.1 Stmt. ¶ 32; *see also* Compl. ¶ 37; Monclova Dep. 83.)

On January 23, 2012, a visitor made a complaint that plaintiff was rude to her while searching her belongings. (Defs. R. 56.1 Stmt. ¶ 33; *see also* Defs. Ex. D (Jan. 23, 2012 email from the Office of Constituent Services to ADW Dario Emans regarding this incident).) Specifically, the complainant alleged that plaintiff commented, "I don't go to McDonalds and tell you how to do your job" and that plaintiff yelled at Bell when Bell intervened. (*Id.*)

Plaintiff disputes that this incident occurred as the complainant alleged and recalls the complainant protesting Monclova's search of her belongings. He also states that Bell sided with the complainant and began to yell at him. (Pl. R. 56.1 Stmt. ¶¶ 33-34; *see also* Monclova Dep. 84; Defs. Ex. L (plaintiff's Jan. 26, 2012 memorandum to Assistant Deputy Warden

Emans).) Bell, however, recalls giving plaintiff a "verbal corrective interview." (Defs. R. 56.1 Stmt. ¶ 34; *see also* Defs. Ex. E (Bell's March 16, 2012 supplemental report to ADW Emans).) Bell later did acknowledge that she was unable to locate a record of complainant's visit to the DOC facility and that the "information as retold by the 311 operator [receiving the complaint] was not exactly what occurred," but did reiterate that she heard Monclova made the comments regarding McDonalds. (Pl. R. 56.1 Stmt. ¶ 33; Defs. Ex. E.)

ADW Emans opened an investigation into the visitor's complaint on January 26, 2012, at which time he ordered both Bell and Monclova to submit respective reports regarding what occurred on January 23. (Defs. R. 56.1 Stmt. ¶ 35; Pl. R. 56.1 Stmt. ¶ 35.) After reviewing plaintiff's report, Bell cited plaintiff for making a false official statement, failing to present a professional demeanor, and failing to "comport [himself] in a manner which will not bring criticism upon [himself] or the Department." (Defs. R. 56.1 Stmt. ¶ 36; Pl. R. 56.1 Stmt. ¶ 36; *see also* Ex E.) Following a review of Bell, Monclova, and Investigating Supervisor Jose Vasquez's respective reports, ADW Emans determined that "the events reported in the [September 23, 2012] #311 complaint were accurate and addressed appropriately." (Defs. R. 56.1 Stmt. ¶ 37; Pl. R. 56.1 Stmt.

¶ 37; *see also* Defs. Ex. F (ADW Emans' Apr. 26, 2012 Memorandum).)

On February 2, 2012, plaintiff was ordered by Bell to write two reports by the end of the day regarding his conduct.[6] (Defs. R. 56.1 Stmt. ¶ 38; Pl. R. 56.1 Stmt. ¶ 38.) When plaintiff responded that he did not have time to complete the report because of his assigned duties, Bell "scream[ed]" at him in front of other employees. (Defs. R. 56.1 Stmt. ¶ 39; Pl. R. 56.1 Stmt. ¶ 39.) On February 3, plaintiff completed the report regarding the February 2 incidents and alleged: "I am being pursued by Captain Bell in retaliation to my official report citing the unsafe practices that she allows visitors to [engage in]." (Defs. R. 56.1 Stmt. ¶ 40; Pl. R. 56.1 Stmt. ¶ 40; *see also* Defs. Ex. G.)

The following day, Bell issued a memorandum to the Health Management Division ("HMD"), in which she requested that plaintiff be referred for a psychological evaluation. (Defs. R. 56.1 Stmt. ¶ 41; Pl. R. 56.1 Stmt. ¶ 41; *see also* Ex. H.) In her request for permission to refer plaintiff to the HMD, Bell cited plaintiff's "being very verbally confrontational with his co-workers and with visitors." (*Id.*) ADW Emans received Bell's

---

[6] It appears from plaintiff's deposition testimony and the February 3, 2012 report written by plaintiff that, on February 2, 2012, plaintiff permitted a visitor proceed into the facility without being searched and that plaintiff informed another supervisor that Bell had permitted him to end his tour early. (*See* Monclova Dep. 104; Defs. Ex. G.)

request and referred plaintiff to HMD. Emans testified that he was "obligat[ed] to follow through" with such referrals. (Defs. R. 56.1 Stmt. ¶ 42; Pl. R. 56.1 Stmt. ¶ 42; Emans Dep. 29.)[7]

Plaintiff was evaluated by Dr. Peter Theo on February 3, 2012. Dr. Theo found that plaintiff was "cooperative with [the] interview, although somewhat guarded and evasive" and that plaintiff showed "[n]o signs of psychiatric disability" but he possessed "some underlying personality traits/ characteristics of a narcissistic nature that can result in situations where he is boastful or critical of others." (Theo Reply Aff. ¶ 3; *see also* Defs. R. 56.1 Stmt. ¶ 43.)[8] Dr. Theo further found plaintiff to be fit for duty, "although unfit for [firearm duty] . . . pending obtaining [a] full [psychological evaluation] report with more details information about his life than he's willing to divulge to [a] DOC . . . psychologist." (*Id.*) On the same day, HMD issued a memorandum to SOD stating that, based on his psychological evaluation, plaintiff was not permitted to carry a firearm. (Def. R. 56.1 Stmt. ¶ 44; Pl. R. 56.1 Stmt. ¶ 44.)

According to ADW Emans' testimony, not having a firearm does not affect a correction officer's ability to obtain

---

[7] "Emans Dep." refers to the deposition of ADW Dario Emans, taken on March 15, 2013 and labeled Exhibit 3 to the parties' Joint Deposition Appendix.
[8] "Theo Reply Aff." refers to Dr. Theo's Jan. 15, 2014 reply affidavit, to which a typed version of his notes from plaintiff's evaluation is attached (ECF No. 38).

a promotion or a preferential post; however, certain positions
may not be held by officers without firearms. (Defs. R. 56.1
Stmt. ¶ 47; Pl. R. 56.1 Stmt. ¶ 47; Emans Dep. 32, 60-61.)
Nonetheless, defendant Bell assigned plaintiff to a position
that required him to have a firearm following plaintiff's
psychological evaluation. (Defs. R. 56.1 Stmt. ¶ 49; Pl. R.
56.1 Stmt. ¶ 49.) Plaintiff testified that he complained to
Bell, who was not responsive, and to Bell's supervisor, ADW
Chin, who ordered that plaintiff be assigned to an area that did
not require firearm authorization. (*Id.*; *see also* Monclova Dep.
118-19.)

Bell testified that later in February of 2012, she
received information from another corrections officer that
plaintiff was carrying a recording device, a violation of DOC
rules. (Defs. R. 56.1 Stmt. ¶ 50; Bell Dep. 125-27; *see also*
Pl. R. 56.1 Stmt. ¶ 50 (disputing that the accusation came from
an officer other than Bell).) After Bell informed her
supervisor, ADW Taylor, that plaintiff may have a recording
device, Taylor, ADW Emans, plaintiff's union delegate, and a
captain asked plaintiff to empty his pockets. Plaintiff
complied, and no recording device was found. (Defs. R. 56.1
Stmt. ¶¶ 51-52; Pl. R. 56.1 Stmt. ¶¶ 51-52.)

On March 4, 2012, a visitor lodged a complaint against
plaintiff, stating that, while the visitor was walking while

holding his toddler son, plaintiff pushed the visitor by the neck and scratched his neck in the process. (Defs. R. 56.1 Stmt. ¶ 53; Pl. R. 56.1 Stmt. ¶ 53; *see also* Defs. Ex. N (Visitor's Mar. 4, 2012 statement).) In response, Bell completed an Incident Report Form, which included a photograph of the visitor's neck injuries and statements from two officers who witnessed the incident, and issued a command discipline to plaintiff. (Defs. R. 56.1 Stmt. ¶¶ 54-55; Pl. R. 56.1 Stmt. ¶¶ 54-55; *see also* Defs. Ex. O (Mar. 4, 2012 Incident Report) and Ex. P (Mar. 4, 2012 Supervisor's Complaint Report).)

### III. Plaintiff's Transfer from Central Visits and Subsequent Termination from DOC

On March 7, 2012, Chief Hourihane transferred plaintiff from Central Visits to the DOC's Rose M. Singer Center. (Defs. R. 56.1 Stmt. ¶ 56; Pl. R. 56.1 Stmt. ¶ 56.) Following plaintiff's transfer, the DOC brought the following charges against plaintiff in relation to his conduct between November 2011 and December 2012: unnecessary use of force, insubordination, and making a false or misleading report (regarding an incident at the Rose M. Singer Center on December 20, 2012); failure to maintain a secure post (regarding an incident at the Anna M. Kross Center on November 9, 2011); unnecessary use of force against a visitor and filing a false or misleading report (regarding the March 4, 2012 incident at

Central Visits); engaging in undue provocation, failure to
report and false reporting (regarding an April 20, 2012
incident); and insubordination, unnecessary force, failure to
report and making a false or misleading report (regarding an
August 9, 2012 incident). (Defs. R. 56.1 Stmt. ¶ 58; Pl. R.
56.1 Stmt. ¶ 58; *see generally* ALJ R&R.)[9]

     Following a four-day hearing in April of 2013 before
Administrative Law Judge Kevin F. Casey at the New York City
Office of Administrative Trials and Hearings, during which
plaintiff was represented and had the opportunity to testify and
present evidence, ALJ Casey found that plaintiff had used
unnecessary force against a visitor and submitted a false report
in relation to the March 4, 2012 incident at Central Visits.
(Defs. R. 56.1 Stmt. ¶¶ 59-60; Pl. R. 56.1 Stmt. ¶¶ 59-60; *see
also* ALJ R&R 9.) ALJ Casey further found that, contrary to
plaintiff's representations, there was "[n]o credible evidence
. . . that Captain Bell fabricated that charge because of a
personal gripe" and that, in relation to all of the charges,
plaintiff "hurled baseless allegations at supervisors, accusing
them of lying, attempted cover-ups, and conspiracies." (Defs.
R. 56.1 Stmt. ¶¶ 60, 62; Pl. R. 56.1 Stmt. ¶¶ 60, 62; ALJ R&R
10, 20.) The ALJ recommended that plaintiff's employment be

---

[9] "ALJ R&R" refers to the June 20, 2013 Report and Recommendation of
Administrative Law Judge Kevin F. Casey, OATH Index No. 1206/13, submitted as
defendants' Exhibit Q.

terminated.  (Defs. R. 56.1 Stmt. ¶ 63; Pl. R. 56.1 Stmt. ¶ 63; ALJ R&R 20.)

Dora B. Schriro, then-Commissioner of the DOC, adopted ALJ Casey's recommendation and terminated plaintiff's employment on July 23, 2013.  (Defs. R. 56.1 Stmt. ¶ 64; Pl. R. 56.1 Stmt. ¶ 64; *see also* Defs. Ex. R (July 23, 2013 termination letter).)

## DISCUSSION

Plaintiff's complaint asserts two causes of action against defendants: first, claims related to Bell's alleged sexual harassment of plaintiff pursuant to Title VII, NYSHRL, and NYCHRL, and, second, for Bell's alleged retaliation against him in violation of Title VII.[10]  The court will first address the legal standard for a grant of summary judgment, and then address plaintiff's sexual harassment and retaliation claims.

As a preliminary matter, however, the court finds that defendant New York City Department of Corrections must be dismissed from the case because, as an agency of the City, it may not be sued.  *See, e.g.*, *Adams v. City of New York*, 837 F.

---

[10] Plaintiff's complaint briefly references both the NYSHRL and NYCHRL in reference to his sexual harassment and retaliation claims.  Plaintiff does not, however, press any NYSHRL or NYCHRL *quid pro quo* sexual harassment or retaliation claims in his opposition papers, despite the fact that defendants have moved against those claims in their moving papers.  The court will, therefore, deem any NYSHRL and NYCHRL retaliation and *quid pro quo* sexual harassment claims abandoned and dismiss them.  *See Taylor v. City of New York*, 269 F. Supp. 2d 68 (E.D.N.Y. 2003) (citing *Douglas v. Victor Capital Grp.*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998)) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").  Nonetheless, as set forth herein, defendants' motion for summary judgment on the NYSHRL and NYCHRL claims is granted because the undisputed evidence as to the material facts warrants judgment as a matter of law in defendants' favor.

Supp. 2d 108, 115 n.1 (E.D.N.Y. 2011) ("Because DOC is a non-suable agency of the City, it must be dismissed as a defendant."); *see also* N.Y.C. Charter § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency"). In addition, the court dismisses all Title VII claims against defendant Bell because "individuals are not subject to liability under Title VII." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000)); *accord Fanelli v. New York*, No. 13-CV-6627, 2014 WL 41660318, at *5 (E.D.N.Y. Aug. 14, 2014) (collecting cases). Similarly, any NYSHRL claims against Bell must be dismissed because "individual liability [under NYSHRL's discrimination provision] is 'limited to individuals with ownership interest or supervisors, who themselves, have the authority to hire and fire employees.'" *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 365-66 (S.D.N.Y. 2012) (quoting *Banks v. Corr. Servs. Corp.*, 475 F. Supp. 2d 189, 199 (E.D.N.Y. 2007)).[11] There is no allegation or evidence in any of the submissions that defendant Bell had

---

[11] Plaintiff's NYCHRL claim against Bell may proceed, however. The NYCHRL provides for individual liability "regardless of ownership or decisionmaking power" where the individual defendant "actually participates in the conduct giving rise to the plaintiff's [discrimination or] retaliation claim." *Malena*, 886 F. Supp. 2d at 366 (internal citations and quotation marks omitted).

hiring or firing authority, and, therefore, she cannot be held individually liable for any NYSHRL violations.

**I.    Summary Judgment Legal Standard**

The court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  The substantive law of the claim governs materiality, because "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 248 (citation omitted).

The moving party carries the burden of demonstrating "the absence of a genuine issue of material fact." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party.  *Id.*  Nevertheless,

the nonmoving party may not rest merely on allegations or denials but must instead offer specific facts supported by admissible evidence showing a genuine issue for trial.  *See id.* ("To defeat a summary judgment motion, the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation.") (internal quotation marks and citation omitted).

## II.  Sexual Harassment Claims

Title VII prohibits discrimination by an employer "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  The Supreme Court has held that it is "[w]ithout question[ that] when a supervisor *sexually harasses a subordinate because of the subordinate's sex*, that supervisor 'discriminate[s]' on the basis of sex."  *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)) (emphases in the original).  Broadly, there are two types of sexual harassment claims that may be brought pursuant to Title VII: hostile work environment harassment and *quid pro quo* harassment.  *Mormol v. Costco v. Wholesale Corp.*, 364 F.3d 54, 57 (2d Cir. 2004) (citing *Leibovitz v. New York City Transit*

*Auth.*, 252 F.3d 179, 188 (2d Cir. 2001)).  Because plaintiff alleges both hostile work environment and *quid pro quo* sexual harassment and addresses both in his summary judgment papers, the court considers each of plaintiff's sexual harassment claims in turn.

### a. Hostile Work Environment

#### i. Title VII and NYSHRL Claims

To establish a claim of a hostile work environment under both Title VII and the New York State Human Rights Law, a plaintiff must establish that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2012) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010)); *see also Bermudez v. City of New York*, 783 F. Supp. 2d 560, 587 (S.D.N.Y. 2011) ("hostile work environment claims under the NYSHRL are treated the same as such claims under federal law.").  In addition, the "plaintiff must establish that the hostile or abusive treatment was because of his or her sex."  *Redd*, 678 F.3d at 175 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

The work environment in question must be both objectively and subjectively hostile:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)).  In determining whether a work environment is hostile, courts "look[] at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris*, 510 U.S. at 23) (internal quotation marks omitted).

The Second Circuit has noted that, although it is difficult to draw the line between conduct that creates a hostile work environment and that which does not, "[o]n one side lie complaints of sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; [and] obscene language or gestures. . . . On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse and boorish workers." *Redd*, 678 F.3d at 177

(internal citation and alterations omitted). It is well-settled, however, that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (quoting *Faragher*, 524 U.S. at 788).

As detailed above, plaintiff alleges that Bell visited him at his SOD post and asked him questions about his background and marriage while her shirt was unbuttoned, but she was not exposed. Bell's personal questions to plaintiff during these visits and in public conversations included whether he would cheat on his wife and comments about his wife's immigration status. Bell also discussed plaintiff's family background with him on other occasions and sent him and other employees a Thanksgiving text message that included the phrase "I love you and I'm thankful for having you in my life." Bell also spoke about her ex-boyfriend with plaintiff and another colleague and discussed with plaintiff whether to send her son to boarding school. Finally, Bell criticized plaintiff's work performance on several occasions, including telling plaintiff that a visitor was uncomfortable with the way plaintiff was standing because the visitor could see plaintiff's genitals pressing against his pants.

As a preliminary matter, the undisputed facts on the record do not establish that plaintiff's treatment was based on his gender. Bell's comments appear to have been predominately neutral comments regarding plaintiff's family and work performance, not comments related to sex, or, as in the case of Bell's discussion of an ex-boyfriend and the Thanksgiving text message, to involve other colleagues, both male and female. *See Cristofano v. Lake Shore Cent. Sch. Dist.*, 473 Fed. App'x 28, 30 (2d Cir. 2012) (noting that "[w]hile facially neutral incidents may be considered among the totality of the circumstances in any hostile work environment claim, there must be a circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory" and holding that because most of a supervisor's allegedly objectionable comments were gender-neutral, plaintiff could not prevail on her hostile work environment claim); *Dall v. St. Catherine of Siena Med. Ctr.*, 66 F. Supp. 2d 167, 190 (E.D.N.Y. 2013) (a male plaintiff's evidence that two female colleagues "spoke frequently about their sex lives and showed explicit photographs in the workplace" did not establish that he was subjected to a hostile work environment based on his gender). Although plaintiff asserts in a conclusory manner that Bell's questions about his wife or family history were an expression of sexual interest, even viewing the facts in a light most favorable to the

plaintiff, there is little indication in the record that Bell's treatment of plaintiff was sexually motivated.

Additionally, viewing the record as a whole and all facts in the light most favorable to plaintiff, and applying the Supreme Court's *Faragher* factors, the court finds that Bell's actions did not create a hostile work environment because her allegedly harassing interactions with plaintiff were sporadic, not pervasive, and were not abusive or threatening. *See Faragher*, 524 U.S. at 787-88. According to plaintiff, Bell's brief visits while supervising patrol to plaintiff's post occurred two or three times a week, but more than a month could pass without Bell having a personal conversation with plaintiff or seeing plaintiff. Other than the visits to plaintiff's post, plaintiff identifies several discrete conversations with Bell in 2011 prior to his transfer to Central Visits that he found objectionable. These conversations do not constitute pervasive harassment. *See Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) ("[I]ncidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive" (internal quotation marks and citation omitted)); *Spina v. Our Lady of Mercy Med. Ctr.*, No. 97-CV-4661, 2003 WL 22434143, at *3 (S.D.N.Y. Oct. 23, 2003) (plaintiff could not establish a hostile work environment claim where she could not

recall more than six instances of allegedly harassing conduct over a 15 month period).

Most crucially, Bell's comments to plaintiff do not constitute the type of threatening or harassing conduct prohibited by Title VII. Indeed, Bell's questions regarding plaintiff's family background and marriage are the type of "off-hand remarks" that courts have held do not create a hostile work environment. *See, e.g.*, *Drummond v. IPC Int'l, Inc.*, 400 F. Supp. 2d 521, 530 (E.D.N.Y. 2005) (supervisor's remarks about her sex life to plaintiff were "mere offensive utterance[s]" that did not amount to a hostile work environment (internal citation omitted)).

Far more sexually-charged and inappropriate conduct has been found by courts in this circuit not to be severe or pervasive enough to create a hostile work environment. For example, the Second Circuit recently held that, where, over a seven year period, an employee's supervisor "occasionally commented on [plaintiff's] physical appearance," "participated in a bet with three other male employees as to whether [the supervisor] would be able to engage [plaintiff] in sexually explicit conversation," engaged "in conversation unrelated to work once a month for three-and-half years," and "briefly made contact with the side of [plaintiff's] body," among other actions, the "record [was] insufficient as a matter of law to

permit a reasonable factfinder to identify a hostile work environment based on sex." *Cristofaro v. Lake Shore Cent. Sch. Dist.*, 473 Fed. App'x 28, 30 (2d Cir. 2012). The Circuit Court noted that the supervisor had "never touched [plaintiff] in a sexual or suggestive manner, and never asked her out or to engage in sexual acts with him" and, accordingly, "the record [indicated] only limited, infrequent, and at worst, mildly offensive conduct falling well short of the severity and frequency required to raise a triable issue of fact as to the existence of an objectively hostile work environment." *Id.* (citing *Alfano v. Costello*, 294 F.3d 365, 379-80 (2d Cir. 2002)). Other courts have similarly emphasized that conduct must be sufficiently severe in order to satisfy the hostile work environment standard. *See, e.g.*, *Godineaux v. Laguardia Airport Marriott Hotel*, 460 F. Supp. 2d 413, 422-23 (E.D.N.Y. 2006) (holding that defendant's sexual comment and gestures in front of plaintiff, defendant's promise that defendant would "give Plaintiff stock tips if Plaintiff would sleep with him," and defendant's attempt to kiss plaintiff "did not rise to the level" of a hostile work environment); *DeSimone v. JP Morgan/Chase Bank*, No. 02-CV-7039, 2004 WL 2978011, at *6 (S.D.N.Y. Dec. 22, 2004) (granting defendant's motion for summary judgment on plaintiff's hostile work environment claim where, over a six-week period, plaintiff's supervisor "asked her

out for drinks and dinner repeatedly, despite being rejected each time," "leered and stared at [plaintiff's] body during their encounters in the office," and made derogatory comments about other female employees); *Spina*, 2003 WL 22434143, at *3 (holding that defendant's actions were not sufficiently severe to create a hostile work environment where plaintiff's supervisor called her a "bitch," complimented her hair and eyes, and told her she "looked good in tight pants"). Based on the record before the court, Bell's interactions with plaintiff fall far short of the hostile work environment standard.

For the foregoing reasons, plaintiff's hostile work environment claim pursuant to Title VII and the NYSHRL is dismissed.

### ii. NYCHRL Claims

Hostile work environment claims under the NYCHRL are evaluated under a more liberal standard than claims made pursuant to Title VII or the NYSHRL. To succeed on a hostile work environment claim under the NYCHRL, a plaintiff "need not establish 'severe and pervasive' conduct . . ., so long as the behavior complained of is worse than 'petty slights and trivial inconveniences.'" *Adams v. City of New York*, 837 F. Supp. 2d 108, 128 (E.D.N.Y. 2011) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, No. 09-CV-1251, 2011 WL 3586060, at *9 (S.D.N.Y. July 29, 2011), *vacated on other grounds by* 715 F.3d

102 (2d Cir. 2013)).  Nonetheless, "a plaintiff must still establish that [he or she] suffered a hostile work environment *because of her gender*" to prevail on a NYCHRL sexual harassment-hostile work environment claim.  *Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 451 (E.D.N.Y. 2013) (collecting cases) (emphasis in the original).

Because plaintiff's NYCHRL hostile work environment claim is the sole non-federal claim remaining in the case in light of the fact that plaintiff does not appear to invoke the NYSHRL and NYCHRL in relation to his *quid pro quo* sexual harassment and retaliation claims, and because for the reasons set forth herein, the court finds that all of plaintiff's federal claims should be dismissed, it declines to exercise supplemental jurisdiction over plaintiff's NYCHRL claim.  *See* 28 U.S.C. § 1367(c)(3) (providing that district courts may decline to exercise supplemental jurisdiction over state law claims where "the district court has dismissed all claims over which it has original jurisdiction"); *see also Thompson v. New York City*, No. 12-CV-8034, 2013 WL 6409326, at *12 (S.D.N.Y Dec. 9, 2013) (declining to exercise supplemental jurisdiction over plaintiff's hostile work environment claim under the NYCHRL after all federal claims were dismissed in part because of the differing standards for evaluating Title VII and NYCHRL claims).

Even if the court were to exercise jurisdiction, it would nonetheless find plaintiff's NYCHRL claim to be meritless. For the same reasons discussed above, Bell's undisputed behavior amounts to no worse than "petty slights and trivial inconveniences," and does not establish that Bell acted due to plaintiff's sex. Moreover, although conduct that creates a hostile work environment under the NYCHRL need not be as severe as that which will satisfy the Title VII standard, it nonetheless must be more than trivial. *See, e.g.*, *Adams*, 837 F. Supp. 2d at 128. Plaintiff's complained-of conduct, primarily Bell's asking him personal questions with her shirt was unbuttoned but while she was not exposed, does not rise to this level. *See Anderson v. Davis Polk & Wardwell LLP*, 850 F. Supp. 2d 392, 404 (S.D.N.Y. 2012) (holding that plaintiff's allegations that his supervisor would stand in such a way at his desk that she would "place her vagina . . . inches from [plaintiff's] face" did not state a NYCHRL hostile work environment claim); *Magoni v. Smith & Laquercia, LLP*, 701 F. Supp. 2d 497, 503-04 (S.D.N.Y. 2010) (holding, after trial, that the fact that plaintiff's supervisor shared details of his sex life with plaintiff and called her voluptuous did not establish an NYCHRL hostile work environment claim). Accordingly, plaintiff's NYCHRL hostile work environment claim is also dismissed.

### b. *Quid Pro Quo* Sexual Harassment

"[Q]*uid pro quo* harassment occurs when 'submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual.'" *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir. 1994) (quoting 29 C.F.R. § 1604.11(a)(2) (1993)), *modified in part by Faragher*, 524 U.S. 775; *accord Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 108 (E.D.N.Y. 2011). "Accordingly, to establish a *prima facie* case of *quid pro quo* harassment, a plaintiff must present evidence that [he] was subject to unwelcome sexual conduct, and that [his] reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of [his] employment." *Karibian*, 14 F.3d at 777. In general, a tangible employment action for purposes of this analysis is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir. 2006) (quoting *Mormol*, 364 F.3d at 57). "A tangible employment action in most cases inflicts direct economic harm, but there is no requirement that it *must* always do so." *Mormol*, 364 F.3d at 57 (internal citations and quotation marks omitted; emphasis in the original) (holding that

plaintiff did not suffer a significant change in employment status where she was issued a disciplinary notice that was not put in her file or, per her employer's policy, signed by a manager); *see also Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 97 (2d Cir. 2002) (holding that where a plaintiff "submit[s] to sexual acts . . . as a basis for [her employer] granting her a job benefit," the plaintiff has established a claim of *quid pro quo* sexual harassment).

For the reasons stated above, the undisputed facts fail to establish that any of Bell's actions or works amounted to sexual advances toward plaintiff. Even assuming that defendant Bell had made sexual advances toward plaintiff that he rebuffed, however, plaintiff's *quid pro quo* claim would nonetheless fail because there is no evidence that any changes in his employment were made based on his reaction to the alleged harassment.

Plaintiff has asserted that the following instances were retaliatory and constitute significant changes in his employment status: 1) Bell's reprimand of plaintiff in relation to his January 23, 2012 interaction with a visitor, involving comments about McDonald's, which led to disciplinary charges being filed against plaintiff and an investigation by ADW Emans; 2) Bell's referral of plaintiff to the HMD for a psychological evaluation, which resulted in a change in his firearm status;

and 3) Bell's write-up of the March 4, 2012 incident in which a visitor suffered scratches on his neck when plaintiff pushed him, which led to plaintiff's transfer from Central Visits and was one of many instances that resulted in his eventual termination.[12]  None of these disciplinary actions is causally connected to plaintiff's alleged refusal of Bell's sexual advances.  *See Clarke v. Pacifica Found.*, No. 07-CV-4605, 2011 WL 4356085, at *10 (E.D.N.Y. Sept. 16, 2011) ("Plaintiff must . . . prove that there was a causal connection between [his] reaction to the unwelcome sexual advances and the adverse employment action.").

Bell's reprimand of plaintiff on January 23, 2012 was based upon a visitor's complaint against plaintiff made through New York City's 311 system.  Although plaintiff disputes the veracity of the complainant and Bell's accounts and the appropriateness of Bell's verbal reprimand immediately following the incident (*see* Pl. R. 56.1 Stmt. ¶¶ 33-34), he cites no evidence at all that Bell's actions were motivated by plaintiff's response to her alleged sexual advances.  To the contrary, ADW Emans found, following an investigation by another

---

[12] Bell's meetings with plaintiff on December 14 and 21, 2011 regarding visitor complaints about plaintiff, her verbal reprimand of plaintiff sometime in December of 2011, her instruction to plaintiff to prepare reports of his conduct on February 2, 2012, and her informing ADW Taylor that plaintiff might have a recording device in February of 2012 are not alleged to have resulted and did not result in tangible employment actions.

officer, that the visitor's complaint was accurate and was appropriately addressed by Bell. (*See* Defs. Ex. F.)

Further, the employment consequences flowing from Bell's referral of plaintiff for a psychological evaluation are not attributable to Bell. Dr. Theo's recommendation that plaintiff no longer be permitted to carry a handgun was based on the doctor's independent evaluation of plaintiff. (*See* Theo Reply Aff. ¶ 3.) Accordingly, the undisputed evidence establishes no causal connection between Bell's actions and the change in plaintiff's responsibilities due to his inability to carry a firearm.

Finally, it is indisputable that Bell's decision to file an incident report regarding the March 4, 2012 complaint by a visitor who was pushed and scratched on the back of his neck by plaintiff was unrelated to any inappropriate sex-based behavior on Bell's part. Bell's report was based on the visitor's complaint, photographs of the visitor's injuries, and statements by two officers who witnessed the incident. (*See* Defs. Ex. O.) Further, following a hearing at which plaintiff was represented and able to present evidence and testify, ALJ Casey found that the charges against plaintiff in relation to that incident were substantiated and that there was "[n]o credible evidence . . . that Captain Bell fabricated [the] charge." (ALJ R&R 10.) Plaintiff's transfer shortly after the

March 4 incident and his subsequent termination based on related
and other charges is solely attributable to plaintiff's own
conduct, not defendant Bell's.

In light of the lack of the causal connection between
any tangible employment action and plaintiff's reaction to
alleged sexual harassment by Bell, plaintiff's *quid pro quo*
sexual harassment claims are dismissed.

## III. Retaliation Claim

In addition to his sexual harassment claims, plaintiff
also alleges that defendant Bell retaliated against him for
engaging in protected activity pursuant to Title VII.  In order
to establish a *prima facie* retaliation claim pursuant to Title
VII, an employee must show "(1) [he] was engaged in an activity
protected under Title VII; (2) the employer was aware of
plaintiff's participation in the protected activity; (3) the
employer took adverse action against plaintiff; and (4) a causal
connection existed between the plaintiff's protected activity
and the adverse action taken by the employer." *Gordon v. New
York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000)
(internal quotation marks omitted).

For the purposes of establishing a *prima facie* case of
retaliation, protected activities include "opposition to a
discriminatory employment practice or participation in any
investigation, proceeding, or hearing under Title VII." *Martin*

*v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 227 (E.D.N.Y. 2010)
(quoting *Hubbard v. Total Comm., Inc.*, 347 Fed. App'x 679, 680-
81 (2d Cir. 2009)).  In addition, informal complaints that are
"sufficiently specific to make it clear that the employee is
complaining about conduct prohibited by Title VII" also
constitute protected activity.  *Risco v. McHugh*, 868 F. Supp. 2d
75, 110 (S.D.N.Y. 2012) (citing, *inter alia*, *Rojas v. Roman
Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011)).

      In addition to the first two factors in establishing a
*prima facie* retaliation claim, the plaintiff must experience an
adverse employment action.  Title VII's "antiretaliation
provision protects an individual not from all retaliation, but
from retaliation that produces an injury or harm."  *Burlington
N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).  A
plaintiff must therefore demonstrate "that a reasonable employee
would have found the challenged action materially adverse, which
in this context means it might well have dissuaded a reasonable
worker from making or supporting a charge of discrimination."
*Id.*; *see also Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d
Cir. 2012) ("a materially adverse change in the terms and
conditions of employment . . . is more disruptive than a mere
inconvenience or an alteration of job responsibilities."
(internal quotation omitted)); *Tepperwien v. Entergy Nuclear
Ops., Inc.*, 663 F.3d 556, 567 (2d Cir. 2011) ("Actions that are

'trivial harms'—*i.e.*, 'those petty slights or minor annoyances that often take place at work and that all employees experience'—are not materially adverse." (quoting *Burlington*, 548 U.S. at 68)).

The final prong of the *prima facie* retaliation analysis, whether there is a causal connection between the protected activity and the retaliation, need not be demonstrated by direct evidence. Instead, "[c]lose temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and a retaliatory action." *Kaytor*, 609 F.3d at 552 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)); *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001)); *see also Summa v. Hofstra Univ.*, 708 F.3d 115, 127-28 (2d Cir. 2013) ("We have regularly held that '[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'" (quoting *Cifra*, 252 F.3d at 217)). While there is no bright-line rule for how close in time the protected activity and the adverse employment action must be, *see Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001), claims are routinely dismissed when as few as three

months elapse between the protected activity and the alleged retaliation. *Breeden,* 532 U.S. at 273-74 (citing with approval cases dismissing retaliation claims where adverse employment action followed protected activity by three to four months); *Hill v. Citibank Corp.,* 312 F. Supp. 2d 464, 480-81 (S.D.N.Y. 2004); *Allen v. St. Cabrini Nursing Home, Inc.,* 198 F. Supp. 2d 442, 450 (S.D.N.Y. 2002); *Nicastro v. Runyon,* 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999).

"If plaintiff sustains the initial burden [to establish a *prima facie* case], a presumption of retaliation arises. In turn . . . the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). If the employer is able to fulfill its burden, the burden then shifts to the employee to "show that retaliation was a substantial reason for the adverse employment action." *Id.* Although a plaintiff need not show that "a retaliatory motive [was] the *sole* cause of the adverse employment action," he or she must "point to evidence that would permit a rational factfinder to conclude that the employer's explanation is merely a pretext." *Malacarne v. City Univ. of New York*, 289 Fed. App'x 446, 447 (2d Cir. 2008) (internal quotations omitted; emphasis in the original). "In other words, an illegitimate, retaliatory motive must be 'at least a

substantial or motivating factor' in the adverse action." *Id.* (quoting *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001)).

Plaintiff argues in his opposition papers that the protected activity in which he engaged was resisting what he perceived as Bell's sexual advances. As plaintiff notes, courts in the Second Circuit are split as to whether the rejection of unwanted sexual advances constitutes a protected activity, and the Second Circuit has not made a definitive ruling on the issue. *See St. Juste v. Metro Plus Health Plan*, --- F. Supp. 2d ----, 2014 WL 1266306, at *28 (E.D.N.Y. Mar. 28, 2014) (collecting cases); *see also Mihalik*, 715 F.3d at 115, n.12 ("offer[ing] no opinion on whether merely rejecting a sexual advance is cognizable under" Title VII and New York state law).

The court will assume for the purposes of this motion that rebuffing a supervisor's sexual advances is a protected activity of which plaintiff's employer was aware. In addition to plaintiff's failure to provide evidence that Bell in fact made sexual advances toward him, plaintiff has not made a sufficient showing of the causal connection between his rejection of the alleged sexual advances and the adverse employment actions he contends began around the time of his transfer to Central Visits on December 11, 2011. Specifically, Mr. Monclova testified that in approximately June of 2010, he rebuffed Bell's advances by telling her that he was married and

40

that he would not cheat on his wife.  He made these statements
to Bell during the period they were both working in the SOD.
(Defs. R. 56.1 Stmt. ¶ 10; Pl. R. 56.1 Stmt. ¶¶ 10, 66; Defs.
Reply R. 56.1 Stmt. ¶ 17; *see also* Monclova Dep. 66.)  Most of
these conversations between Bell and Mr. Monclova took place in
June of 2010 and certainly prior to Bell's transfer from SOD to
Central Visits in April of 2011.  (Defs. R. 56.1 Stmt. ¶¶ 8, 10;
Pl. R. 56.1 Stmt. ¶¶ 8, 10; Monclova Dep. 42-43, 66.)  Plaintiff
further testified that, at the time of his transfer to Central
Visits in December of 2011, Bell began "harassing him" by
yelling at him in front of his co-workers about his job
performance.  (Monclova Dep. 66, 68.)

The connection between plaintiff's rejection of what
he perceived to be Bell's advances and the commencement of
Bell's alleged harassment of plaintiff in Central Visits is too
attenuated to find a causal connection between plaintiff's
protected activity (rebuffing what the plaintiff perceived to be
Bell's unwelcome sexual advances) and the retaliation by Bell.
Plaintiff has presented no direct evidence that Bell's
disciplining plaintiff starting eighteen months after plaintiff
rebuffed Bell in 2010 was causally related to plaintiff's
claimed protected activity.  Moreover, eighteen months passed
between plaintiff informing Bell that he was married and would
not cheat on his wife and Bell's criticism of plaintiff's work

performance, far longer than the generally accepted three month time period for raising an inference of retaliation based on temporal proximity. *See, e.g.*, *Hill*, 312 F. Supp. 2d at 480-81 (holding that no causal connection existed where the protected activity and adverse employment action took place sixteen months apart); *see also Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) (noting that "[t]hree months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation."). Therefore, plaintiff has failed to raise a genuine issue of material fact as to his *prima facie* retaliation claim.

Even if plaintiff could make a *prima facie* retaliation case, it is undisputed that defendants presented evidence of the numerous non-discriminatory reasons for disciplining plaintiff, and plaintiff has not pointed to any facts that would suggest that these disciplinary actions were substantially motivated by plaintiff's alleged rejection of Bell. For example, Bell's December 14, 2011, December 21, 2011, and January 23, 2012 discussions with plaintiff about his behavior were all prompted by complaints made by visitors and other employees. (*See* Defs. R. 56.1 Stmt. ¶¶ 30, 32; Pl. R. 56.1 Stmt. ¶¶ 30, 32.) Plaintiff also does not dispute that his firearm was removed based on Dr. Theo's recommendation (*see* Pl. R. 56.1 Stmt. ¶ 44), or that he was investigated and transferred out of Central

Visits because of his altercation with a visitor on March 4, 2012 (*see id.* ¶ 56). Moreover, the March 4, 2012 incident was witnessed by other officers, the complainant's injuries were photographed, and the charges brought against plaintiff based on the incident were upheld by ALJ Casey. (See Defs. R. 56.1 Stmt. ¶¶ 55-64; Pl. R. 56.1 Stmt. ¶¶ 55-64.) Although plaintiff asserts that these disciplinary actions were taken substantially because he rejected Bell's sexual advances, he presents no evidence at all that would suggest that the documented complaints against plaintiff were mere pretext for a retaliatory motive. *See, e.g.,* *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (upholding the district court's grant of summary judgment to defendant in a Title VII retaliation case because plaintiff failed to "come forward with some evidence of pretext in order to raise a triable issue of fact.").

Accordingly, plaintiff's retaliation claims are dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety, and plaintiff's claims are dismissed. The Clerk of Court is respectfully

requested to enter judgment in favor of defendants and to close the case.

**SO ORDERED.**

Dated:     September 29, 2014
           Brooklyn, New York

                              _____/s_____
                              Kiyo A. Matsumoto
                              United States District Judge
                              Eastern District of New York